# Frederick J. Bawden, Appellant, v. William H. Taylor et al., Appellees.

## Gen. No. 15,892.

1. AMENDMENTS AND JEOFAILS—*when refusal of leave proper.* If an amendment was not necessary to raise the question presented thereby, or if the contention made by it would not change the disposition of the case even if upheld, denial of leave to make such amendment is proper.

2. GAMBLING—*when equity will not ̈ enforce section 130 of the Criminal Code rendering option contracts illegal.* If such a transaction is concluded equity will not interfere on account of the illegality of the contract to place one of the violators of the law at an advantage over the other.

3. CONTRACTS—*effect of execution of illegal.* If there is an executed sale which in the absence of fraud of some kind would have been good entirely without reference to, and without the existence of, any preceding contract for it—optional or otherwise—equity will not set aside such a sale because predicated upon an illegal contract.

4. SALES—*what essential to set aside executed.* In order for a, court of chancery to interfere and set aside an executed sale a conclusive ground must be shown.

5. SALES—*when fiduciary relation not established.* Held, that the evidence in this case failed to establish a fiduciary relation and that such evidence rather showed a situation of distrust, than of special confidence between the parties to the transaction in question.

6. FRAUD—*when silence constitutes.* ''Silence which gives assent'' may sometimes be in law and in fact as active a misrepresentation as spoken or written words.

7. FRAUD—*when not established.* Held, under the evidence that no fraud which justified a court of equity in setting aside an executed sale of corporate stock was established.

Bill in chancery. Appeal from the Superior Court of Cook county; the HON. FARLIN Q. BALL, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed December 21, 1911. Rehearing denied January 8, 1912.

CHILTON P. WILSON, for appellant; ALLEN F. REES, of counsel.

FRANK J. LOESCH and T. J. SCOFIELD, for appellees.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

This is an appeal by Frederick J. Bawden from a decree of the Superior Court of Cook county dismissing, for want of equity, a bill brought in that court by him against William H. Taylor and the corporations, the Taylor Publishing Company and the Hill Publishing Company. The Hill Publishing Company although served did not answer, and no order affecting it was ever entered except the final decree dismissing the bill after an extended hearing upon the bill of complaint, the answer and amended answer of William H. Taylor, the answer and amended answer of the Taylor Publishing Company and the general replications of the complainant thereto.

Before this decree was entered, but after the final submission of the cause to the court, the complainant moved for leave to amend his bill of complaint. This leave was denied.

As we purpose first to dispose of the particular contention specifically raised by the proposed amendment, we shall state at this point the gist of the bill and its prayers, and the further specifically stated contention of the amendment. The bill alleges the existence of the corporation known as the Taylor Publishing Company and the ownership at the time of its incorporation of 400 of its 800 shares by Bawden and of 400 by Taylor. It proceeds in great detail to state the history of the company and of the relations of the stockholders to it and to each other and of the change in the ownership of the stock at various dates. It then avers that false and fraudulent representations were made by the defendant Taylor to the complainant Bawden, and that Bawden "relying on the false and fraudulent representations of said Taylor solely," entered into a contract which is set forth as an exhibit to the bill and made a part thereof, and also delivered to said Taylor

certificates of 400 shares of stock of said Taylor Publishing Company.

The contract alluded to which is denominated "Exhibit H" in the record and in the briefs of counsel, is as follows:

"Memorandum of Agreement made and entered into by and between F. J. Bawden, party of the first part, and W. H. Taylor, party of the second part,

Witnesseth: Whereas, said F. J. Bawden is the owner of Four Hundred (400) shares of the capital stock of the Taylor Publishing Company;

And Whereas, said party of the second part desires an option to purchase said four hundred (400) shares of the capital stock of the Taylor Publishing Company so owned by said Bawden;

Now Therefore, in consideration of the sum of one dollar in hand paid each to the other, the receipt whereof is hereby acknowledged, the said F. J. Bawden hereby gives to the said W. H. Taylor the option, to be exercised by him on or before ten days from the date hereof, to purchase his said Four Hundred shares of the capital stock of the Taylor Publishing Company for the sum of Sixty-six Thousand Two Hundred Fifty Dollars, and the said Bawden hereby covenants and agrees immediately upon notice from said Taylor to him to at once sell and deliver said Four Hundred shares of the capital stock to said Taylor upon the terms and conditions as herein provided as follows:

At the time of the delivery of said stock by said Bawden to said Taylor, said Taylor shall pay the sum of Ten Thousand Two Hundred Fifty Dollars in cash. On May 1, 1908, he shall pay the sum of Fifteen Thousand Dollars in cash, and one year from the date of the transfer of the stock he shall pay the sum of Twenty-five Thousand Dollars in cash, and two years from the date of the transfer of the stock he shall pay the sum of Sixteen Thousand Dollars in cash, with interest at the rate of six per cent. per annum on the deferred payments. Said sums of Fifteen Thousand Dollars, Twenty-five Thousand Dollars and Sixteen Thousand Dollars due May 1st, 1908, one year and two

years respectively, shall be given in the form of collateral notes by said Taylor and secured by the bonds of the Hill Publishing Company of New York, for the face value of Fifteen Thousand Dollars, Twenty-five Thousand Dollars and Sixteen Thousand Dollars respectively, and shall be held with each of said notes until the same is paid; that upon the payment of the respective notes for Fifteen Thousand Dollars, Twenty-five Thousand Dollars and Sixteen Thousand Dollars, the bonds in the sums of Fifteen Thousand Dollars, Twenty-five Thousand Dollars and Sixteen Thousand Dollars respectively of the Hill Publishing Company, held as collateral with said notes shall be at once released and delivered to said W. H. Taylor.

It is further provided that said Bawden shall deliver the coupons attached to said bonds to said Taylor whenever the same become due.

Said F. J. Bawden covenants and agrees that he will not sell or dispose of said stock during the said period of ten days from the date hereof, and that immediately upon demand by said W. H. Taylor he will deliver his stock properly endorsed for transfer. As soon as the same is delivered the cash to be paid by said W. H. Taylor and the collateral notes to be executed by said Taylor as hereinbefore set forth, and the bonds of the Hill Publishing Company of New York shall at once be delivered to said Bawden. This agreement shall be binding upon the heirs, executors, administrators and assigns of the respective parties hereto.

In Witness whereof the said parties have hereunto set their hands and seals this fourth day of March, A. D. 1908.

F. J. BAWDEN.   (SEAL.)
W. H. TAYLOR.   (SEAL.) ''

The bill of complaint further alleges that said Taylor paid the complainant $10,250 in cash and gave his notes and bonds of the Hill Publishing Company to the amount of $56,000 to secure the deferred payments, and thereafter from time to time paid the complainant all of the deferred payments except the last, amounting to about $16,000, which sum is still evidenced by the

note of said Taylor secured by bonds of the Hill Publishing Company.

The bill asserts, however, that Taylor was enabled thus to get the stock from Bawden by false and fraudulent representations; that when Taylor had obtained it and, by it, full control of the Taylor Publishing Company, he sold a portion only of the assets of the Taylor Publishing Company to the Hill Publishing Company for a much greater sum proportionately than he had paid for Bawden's interest in the Taylor Publishing Company (the said sum being received in bonds of the Hill Publishing Company), and that the Taylor Publishing Company had still left property "inventoried at about seventy-five thousand dollars." Wherefore the bill avers that the complainant "was and is entitled to four-ninths of the bonds which were the consideration paid by the Hill Publishing Company and four-ninths of the proceeds from the remaining assets of the Taylor Publishing Company not sold to said Hill Publishing Company, less four-ninths of the bonded indebtedness of the Taylor Publishing Company."

The prayer of the bill is for an answer from the defendants setting forth all the facts concerning the sale of assets by the Taylor Publishing Company to the Hill Publishing Company, and the disposition of the consideration received, and that a receiver may be appointed to take possession of all the property, assets, books and papers of the Taylor Publishing Company, to convert the same into cash and distribute them to the complainant and to the other stockholders of the Taylor Publishing Company; that an injunction may be issued restraining the Taylor Publishing Company from disposing of its assets, and an order entered directing it to issue certificates to the complainant evidencing four hundred shares of stock; that Taylor be enjoined from selling or disposing of or voting the four hundred shares of stock acquired from the complainant, and from selling or disposing of the bonds of the

Hill Publishing Company owned or controlled by Taylor "to the amount of the complainant's proportionate four-ninths share of 225 bonds over and above the consideration received by the complainant," and, finally, that the complainant "may also have a decree against said Taylor for such amount as in equity and good conscience may be due to the complainant upon a full and final accounting between the complainant and Taylor, and an accounting from said Taylor as to what disposition he has made of the assets or property of the Taylor Publishing Company; and that the said contract procured from the complainant by said Taylor on or about the fourth day of March, 1908, in reference to said sale of the complainant's four hundred shares of stock in the Taylor Publishing Company may be set aside and decreed null and void, and of no force and effect, and that said Taylor may be required to surrender and deliver up the said certificates so delivered to him by the complainant."

After the hearing had been had on the bill and the chancellor had announced his conclusion that the bill was without equity and should be dismissed, the complainant asked leave to amend his bill by inserting the following paragraph:

"Your orator avers the so-called option contract, Exhibit H., was ineffectual, null and void, and of no force and effect according to the statute in such case made and provided, and there never was any other pretended contract of sale of any kind entered into between your orator and said Taylor attempting or pretending to sell or convey your orator's said stock in the Taylor Publishing Company to said Taylor, and your orator avers he always has been and still is the owner of said 400 shares of stock in the Taylor Publishing Company, and has not received his pro rata share of the bonds or the proceeds thereof received by the Taylor Publishing Company from the Hill Publishing Company for the sale of a part of the assets of the Taylor Publishing Company, and your orator

avers he endorsed in blank and delivered the possession of his said 400 shares of stock to said Taylor after the said Taylor Publishing Company had sold a part of its assets to the Hill Publishing Company for 225 bonds of the Hill Publishing Company of the value of $1,000 each, and your orator delivered the possession of his said stock to said Taylor after said Taylor Publishing Company had received the bonds of the Hill Publishing Company amounting to the sum of $225,000, and your orator avers he has only received from the proceeds of the sale of part of the assets of the Taylor Publishing Company to the Hill Publishing Company the sum of $66,250. And your orator avers he has not received any portion or consideration of the remaining assets of the Taylor Publishing Company not sold to the Hill Publishing Company.''

The court refused the complainant leave to file this amendment and then entered the decree here appealed from.

One of the assignments of error here is that the court erred in refusing to allow complainant to amend his bill.

We do not need to discuss the question whether the amendment was necessary to raise the question which the argument here and that reported in the certificate of evidence as submitted to the chancellor below shows it was the purpose of the amendment to press on the chancellor's attention. We will only say that it seems to us very doubtful whether the decision of the chancellor against the leave to amend was not justified on that ground alone. But waiving that consideration, the amendment should not have been allowed if the contention specifically made by it would, even if upheld, have added nothing to the strength of the complainant's case. If the amendment if made and the contention raised thereunder would have been futile to change the final disposition of the case, leave to file it should have been denied on that ground, even though the original bill did not raise the issue presented by the

amendment. Nor would the assignment of error be effective for reversal in that case, even if well taken. For even though the proposed amendment should have been allowed, if its addition to the bill would not have changed our view of the proper disposition of the cause, error in denying leave to make it, even if it existed, would have been harmless. This we think is the actual state of the matter.

The precise point specifically presented by the proposed amendment and urged in argument is that the "option contract" (Exhibit H to the bill; was illegal under section 130 of the Criminal Code, which provides that it shall be a criminal offense "to contract to have or give to one's self or another the option to sell or buy at a future time * * stock of any railroad or other company. * *." And that "all contracts made in violation of this section shall be considered gambling contracts and shall be void." To bring forward the construction of this statute placed on it by the Supreme Court in several cases, as it is claimed, as applicable to the contract expressed in Exhibit H, was the object of this amendment. It seems unnecessary to us to discuss at length, as does the counsel for appellee, the doubtful proposition that the contract in question, Exhibit H, was not within the prohibition of the statute or the other proposition, better fortified perhaps by authority, that equity would in no event, after the transaction was concluded, interfere, on account of the illegality of the contract, to place one of the violators of the law at an advantage over the other.

For, assuming both the illegality of the contract and the power of equity to set it aside at the instance of one of the parties, it has now little to do with the essential matter involved in this litigation. Nobody is now attempting to enforce this option contract nor defending against such an attempt.

Bawden on March 4, 1908, made a contract to sell to Taylor, if Taylor should decide within ten days to take it at the price mentioned, certain stock in the Taylor Publishing Company. This contract, on account of its being prohibited, was, in the language of appellant's counsel, "ineffectual, null and void, and of no force and effect." If this be granted, what follows? Merely that it could not have been enforced had Bawden declined to carry out his agreement. But he did carry it out. He sold and delivered the stock in question, and he received the consideration named in the contract in substitution therefor. There was an executed sale, which, in the absence of fraud of some kind, would have been good entirely without reference to, and without the existence of, any preceding contract for it—optional or otherwise.

The gist of this litigation is that this executed sale should be revoked, cancelled and undone; not that the negotiations or the memoranda of agreements previously made should be abrogated.

Counsel for appellant say that "what has been done or paid *under* a contract in violation of section 130 of the Criminal Code may be undone or recovered back;" and cites various subsequent sections of the Criminal Code and the case of Pratt v. Ashmore, 224 Ill. 587, to justify this statement. If this proposition is to be understood (as, to make it applicable herein, it must be) to mean that a voluntary executed sale with delivery to the purchaser of the stock or merchandise sold, and with reception by the seller of the purchase price, can be set aside by either party if he can show that prior to such sale an illegal "option" contract on said stock or merchandise had been entered into by him with the other party, and that the sale otherwise entirely legitimate, was made on the same terms mentioned in the option contract, then we totally dissent from it. Pratt v. Ashmore was not such a case. It involved a settlement of an illegal wager contract, not a legiti-

mate purchase or sale preceded by an illegitimate and unnecessary "option" contract.

The true questions at issue in this litigation are, first, should the actual sale of the stock in the Taylor Publishing Company by Bawden to Taylor be set aside as secured by fraud? And, secondly, if so, what relief under the circumstances should be given to Bawden? It being impossible to put the parties in *statu quo,* what accounting should be decreed as justice between the parties?

Of course the consideration of the second question becomes necessary only if the first should be answered in the affirmative.

.Our conclusion being, as was that of the learned chancellor, that this answer cannot properly be given, the second of the questions involved may be disregarded in this opinion. For our conclusions on the first we will note our reasons. It is obvious that substantial and conclusive grounds must be shown to warrant a court to set aside on a bill brought in January, 1909, an executed sale in which the delivery of all the stock to the purchaser was made March 9, 1908, and the consideration then paid partly in cash and partly in secured notes, especially perhaps when the larger part of these notes were paid when due or in anticipation of their due date, and the money received and accepted by the complainant on one of them for $25,000 some three months after correspondence had taken place indicating that some information at least of what he now insists was fraudulent concealment vitiating the sale had come to him.

Such substantial and conclusive grounds the complainant, however, claims to have, alleging that Taylor secured the sale by (a) active and gross misrepresentation of existing facts, and (b) by fraudulent concealment of facts which he should have revealed to Bawden.

This second ground he bases on the existence of a fiduciary relation between Bawden and Taylor at the time of the sale and of the negotiations and contract leading up to the same, which required the disclosure of that which Taylor concealed.

He alleges in his bill, apparently as explaining his acquiescence in the sale and receiving without protest or caveat a considerable portion of the proceeds of the same as late as October, 1908, that he did not know the facts or the correct details of the transactions which he claims should have been revealed to him until about the time he filed his bill, although admitting that he had some "slight information" in regard to them which led to a letter of inquiry in July, 1908.

This allegation of the bill was denied by the answer of Taylor, who averred therein on information and belief that complainant was in May, 1908, possessed of full knowledge of the facts he says were fraudulently concealed from him, and could have learned them prior to his delivery of the stock in question.

Mr. Bawden did not offer any evidence as to what his information was in May, 1908, but did testify that he first learned of the precise state of things which he complains was concealed from him in December, 1908, and January, 1909.

The matters which it is claimed should have been revealed by Taylor to Bawden on account of the alleged fiduciary relation, are negotiations with the Hill Publishing Company which Taylor was conducting at the time of the contract of March 4, 1908, and which had been concluded before March 9, 1908, when the sale was actually made and the bonds and consideration passed.

In January, 1908, Taylor, who was president, treasurer, and a director of the Taylor Publishing Company, the business of which company was the publication of a trade journal, called "The Engineer," was in New York and submitted to the Hill Publishing Com-

pany, which published a similar paper appealing to
the same or similar clientage, a proposition, oral or
written, to sell to it for $225,000 ''The Engineer,''—
that is, the subscription lists, advertising contracts,
good will, etc., which make up the value of a trade
paper and passes under the name of the paper as a
mercantile asset. An intermediary or broker named
Harris was connected with the negotiations. Mr. Hill,
the president of the Hill Publishing Company, re-
jected for that company this offer, but made a counter
proposition in writing to purchase ''The Engineer''
for $150,000 providing Taylor personally would agree
''to abstain from publishing or being financially inter-
ested in or in any way connected with any paper de-
voted primarily to the generation or transmission of
power for stationary industrial purposes for a period
of twenty-five years in any State or Territory of the
United States.''

Two days before this offer in writing—perhaps in
anticipation of it, but at all events before it was actu-
ally made—Taylor, who had previous communications
with Bawden at various times about the realization by
Bawden on the interest Bawden had in the Taylor Pub-
lishing Company, telegraphed Bawden:

''Am offered twenty thousand cash and twenty thou-
sand cash May one and twenty-five thousand bond one
year, absolute security, sixty-five thousand total. En-
gineer will be consolidated in New York if sold. An-
swer quick.''

As Bawden owned four-ninths of the outstanding
stock of the Taylor Publishing Company, a share of
$150,000 proportionate to his holdings would be $66,-
666.66. To this Bawden replied by telegram to Taylor
on the same day:

''My interests should be worth ninety-five thousand.
Will sell for seventy thousand, twenty-five thousand
cash, twenty thousand May First and twenty-five thou-
sand one year, deferred payment absolutely secured.

This offer for immediate acceptance only.

F. J. Bawden.''

On January 13, 1908, the day on which the written proposal was made by the Hill Publishing Company, Taylor wrote Bawden:

''Just got final decision from party who wanted to buy 'The Engineer.' They will not pay the price you named in your telegram. Personally I regret your decision to increase your price. Had I known that your price would be more than $67,500 I never would have made the effort which was made altogether for your interest and not for mine, as I should be the big loser and not yourself.''

Further correspondence followed: Under date of Jan. 15th Bawden writes to Taylor that $67,500 was the price fixed by Taylor ''on my interests,'' Nov. 1st, but that two months' additional business should have added to their value, and says: ''I regret very much that the slight difference should have been considered sufficient to cancel any partial agreement which the parties may have had under consideration.''

Jan. 16th Taylor writes to Bawden, among other things:

''I have yours of the 15th * * and in response wish to advise that the Hill Pub. Co. of N. Y. wanted the Engineer very much to consolidate with Power. * * They made an offer far below the actual value of The Engineer—so low that unless you were willing to take a low price for your stock, the price was absolutely hopeless.''

January 18th Bawden writes Taylor:

* * ''I note that the Hill Publishing Company wanted the Engineer very much to consolidate with Power, but that they made you an offer far below the actual value of our interests. Will you please tell me just the amount they offered. As the price I put on my interest was $175 per share, it would be on the basis of 900 times $175, making a total of $157,500, to which should be added our indebtedness to McGraw $22,000, making a total value of the Taylor Pub. Co., $179,500;

but you say that unless I am willing to take a lower price for my stock, the offer of the Hill Pub. Co. was hopeless. * * * Now from every reasonable point of view and in all fairness, it would appear only reasonable that I should be informed as to what offer was actually made for the purchase of our Company. We must have some money in the Bank and the actual cash paid for the business in 1903 amounted to more than the basis on which I am now valuing my interests. * * *''

January 20, 1908, Taylor writes Bawden:

"Your letter of the 18th arrived at the house yesterday, and in response wish to advise that the price offered by Mr. Hill was $150,000. Of this amount over $6,000 had to be paid to Mr. Harris for commission. The matter went so far that it was in the shape of a contract which I believe is now in the hands of Mr. Harris. The matter has now gone by, as Mr. Hill has bought another publication—the Engineers Review of Cleveland."

January 21st Bawden writes to Taylor:

"I beg to acknowledge receipt of your letter of the 20th instant advising that the price offered for the Taylor Publishing Company by Mr. Hill was $150,000—$6,000 of which would be paid to Mr. Harris for commission. You did not make it clear however that it was on the basis of these figures that you telegraphed me to the effect that you were offered $65,000 for my interests, which indicated to me that some satisfactory offer had been presented to yourself, but it is hard for me to believe that you would have considered for a moment the sum mentioned."

January 23rd Bawden writes again to Taylor, alluding to a coming stockholders' meeting of the Taylor Publishing Company, urging economy in the expense account, declaring "this is a period of retrenchment," and enclosing extracts from letters which had come to his notice "from other large concerns urging economy." He says:

"I was very much surprised at the information contained in your letter of the 20th inst. to the effect that Mr. Hill had offered only $150,000 for the business, as up to a very short time ago a much higher valuation had been placed on it. * * * * * * You say the sale to Hill fell through because they would not pay $70,000 for my four-ninths interest, and you did not think I would ask more than $67,500. I regret this very much on your account, but as you know I was not informed even of your intention to go to New York, and knew absolutely nothing of your plans or I would undoubtedly have co-operated with you as I did in persuading McGraw to join us when you failed. * * * * *

"I was also very much surprised to learn from your letter of the 20th inst. that you had bought fifty-one shares of Mr. Shaw's stock, thereby securing control of the outstanding stock. * * * *"

To this on Jany. 27th Taylor replied:

"Mr. F. J. Bawden,

My dear Sir: I have your letter of Jan. 23rd, contents carefully noted. I note that you sent copies to Mr. Shaw and Mr. Rice. Many thanks for bringing our private matters to their attention. Also wish to call attention to a discrepancy on page 3 of your letter in which you infer that the price you made to me for your share was $70,000. The telegram which I received in New York City reads $25,000 cash, $25,000 May 1, and $25,000 deferred payment, making $75,000 in all.

Mr. Hill was undoubtedly looking for a bargain when he offered the price mentioned in my letter. However, I was disappointed that the sale did not go through for the reason that I would have been more than pleased to see you get your money out of the Taylor Publishing Company. Regarding your telegram, wish to acknowledge that I received it and believe that I understand in what spirit it was sent. Mr. Shaw sold 51 shares of his stock to me because we all felt that the Company was very much safer in my hands than out of it.

Your suggestions regarding economical conduct of this Company have been received. * * * The two en-

closures on panicky times and retrenchments were very nicely written. We sent out a folder, copy of which I am enclosing herewith, entitled 'Do not let Fear Ruin Business,' which was received very favorably. * * * *
Very respectfully yours.''

January 28th Mr. Bawden replied:

''I have just received your letter of the 27th instant and note your remarks expressing thanks for bringing our private matters to the attention of Messrs. Shaw and Rice in my letter of Jan. 25th. In this connection I wish to say that at the time of dictating my letter it had not occurred to me that anything said would be considered by you as exposing any transaction which should have remained private, and in rereading the letter now I am unable to determine to just what subject you refer. You call my attention to a discrepancy as to the price of my interests wired you in New York and that the telegram received by you read $75,000 instead of $70,000. I am enclosing herewith copy of my message, which not only says $70,000, but divides the payments into three, making a total of that amount. I cannot make up my mind as to just what you mean in remarking on my telegram of January 25th, of which you only acknowledge receipt. It would appear to me that the least reply that could be made by you or your board of directors was some consideration of the proposal which from all information given in your letters we are constrained to believe was the same as that favorably considered by you when coming from Mr. Hill. You certainly have no reason to doubt the sincerity of any proposition coming from me, and why one should not receive at least the same consideration as that proposed by any person is difficult to conceive. I note your short explanation as to the reason Mr. Shaw had for selling his fifty-one shares of stock. * * *''

February 22, 1908, Taylor writes from Chicago to Bawden that ''Power,'' the competing paper published by the Hill Publishing Company, had become a weekly from a monthly and cut advertising rates, and proceeded:

"Of course it's too early to know just what effect it will have on our business. I am in hopes it will not be serious, but the fight is on and will probably last two or three years.

"I have business that takes me to New York City to-night, and there is a possibility of the sale of The Engineer coming up again, although I have no assurances of it, but I would like to be in a position to act quickly if a new offer is made, and for this reason I wish you would write me in care of the Belmont Hotel, New York City, and let me know by return mail if you still wish to sell your stock and if the following terms are satisfactory: $10,000 cash when stock is delivered to me, $15,000 cash May 1, 1908, $25,000 one year from date and $15,000 due one and one-half years from date, making a total of $65,000, interest at 6%, security absolutely satisfactory. It is altogether likely that if an offer is made now a very little cash will be available on account of the slowness of collections. I cannot possibly give you better advice than to accept these terms; this will get you out slick and clean. With Power a weekly at $2 per year, no other concern will offer any such amount for years to come, not at least until Power works out its own salvation and it becomes clear that The Engineer can stand the pace. I hope you will be explicit in your letter so that if I receive an offer I can cinch the bargain. Hoping to receive your letter on Wednesday in New York, I am," etc.

Bawden telegraphed to Taylor in New York on Feb. 25th:

"Letter received today. Should get at least sixty-seven thousand and five hundred, terms payment satisfactory. Wire if you have definite proposition."

February 29th, which was Saturday, Taylor telegraphed from New York to Bawden: "Sixty-five best can do. Meet me Chicago Monday. Bring stock. W. H. Taylor. 4 P. M."

Bawden in reply telegraphed Taylor at Chicago that he would leave Houghton Monday and see him in Chica-

go Tuesday morning. On Tuesday morning, March 3rd, Bawden and Taylor met at the Auditorium Hotel in Chicago. The conversation that then took place between them is a matter of dispute between them, as we shall hereinafter note, but here it is only necessary to say that they practically agree that Taylor wanted Bawden to give him an ''option'' on his stock, and Bawden expressed a disinclination to do so on the ground that the proposed sale might be made without it.

The next day, March 4th, which was Wednesday, Mr. Bawden had another interview with Mr. Taylor and with Mr. Taylor's lawyer, Mr. C. F. Loesch, whom Mr. Taylor had then brought into the matter, and the ''option'' contract or agreement (Exhibit H) which had been prepared by Mr. Loesch was presented to Mr. Bawden and by him signed.

The following day, March 5th, Mr. Bawden caused to be written from his bank at Houghton, Michigan, where he resided and to which he had returned, a letter to the First National Bank of Chicago, enclosing the certificate of 400 shares of stock in question, with directions to deliver it on payment of $10,250 in cash, and the three notes (as described in Exhibit H), with the 56 bonds of the Hill Publishing Company described in the said Exhibit as collateral, and concluding:

''Accompanying the bonds will be a certificate from the Secretary of the Hill Publishing Co. of New York certifying that they are the bonds issued by the Hill Publ. Co. On the payment to you of $10,250 and the delivery of the several notes with the collateral, you will please credit our account with the payment and forward the notes and collateral to this bank.''

On the 9th of March the delivery of the stock here authorized on the conditions required was made by the Bank to Mr. Taylor, and with the money and notes forwarded by the First National Bank to its correspondent at Houghton was the following certificate:

"Hill Publishing Company.

Extracts from Minutes of a Meeting of the Board of Directors of the Hill Publishing Company held at their offices 505 Pearl St., New York City, on the 5th day of March, 1908.

On motion of Mr. Halsey seconded by Mr. Dugalls and carried unanimously, it was resolved to authorize the President of the Company to buy 'The Engineer' for $225,000 and to issue bonds for that purpose.

I, R. McKean, Secretary of the aforesaid corporation, do hereby certify that the foregoing extract from the Minutes of the Board of Directors of the aforesaid corporation, is a correct transcript of the resolution authorizing issuance of bonds for the purchase of 'The Engineer' and of the whole of such resolution, and further that since the adoption of such resolution it has not been altered, revoked or modified in any manner whatever.

Dated New York, March 7, 1908. R. McKean, Secretary."

The bonds of the Hill Publishing Co. sent with the notes to the Houghton Bank were numbered consecutively from 151 to 206. Each bond was for $1,000 and recited that it was one of an issue of 225.

The purchase of Bawden's stock by Taylor was thus consummated on March 9, 1908. It was not questioned or criticised by Bawden in any way until July 20, 1908, when he wrote Taylor:

"At the time of obtaining my consent to the sale of the Taylor Publishing the basis of value of my holdings was arrived at through your representations, as you know, and the sale price of the whole as understood by me was $150,000, which was much below what I considered the business worth and so stated at the time, but relying entirely upon your knowledge of what the future might be and the effect which might follow the change in the number of issues of Power and that unless I would sell on the offer made by Hill there would be no sale and we would have to take our chances on continuing with the business (and) feeling that the

success of the business depended largely upon your knowledge and efforts, I was reluctantly persuaded to accept the conditions as represented by you at that time. Information however has since come to me which would indicate that a much higher figure had been named as the purchase price and was actually obtained. Considering my large interests in the business I hope you will consider it pertinent for me to ask what if any change was made in Mr. Hill's offer for our business other than the one of $150,000 mentioned by you and upon which the value of my holdings was based.''

To this letter Taylor replied on July 24th expressing astonishment at its contents. He says:

''How you could use the words 'reluctantly persuaded' after importuning and pounding me to get you out of the Taylor Publishing Co. for four years, is past my comprehension. The Engineer was not sold because I wanted to sell, but because you wanted to sell. In selling The Engineer I made tremendous sacrifices; you made none. At the time I contracted to buy your stock the best offer that I had received from anybody was $150,000 from the Hill Publishing Co. At the time the contract in question was made between yourself and myself I had neither a contract nor a tentative agreement with anybody to sell The Engineer or any part of The Engineer. When the contract was made, I made it very plain that unless you would sell for the figure we agreed upon, The Engineer would not be sold.''

After this, as late at least as October 7, 1908, Bawden, on request of Taylor, forwarded to the First National Bank of Chicago for collection Taylor's note of $25,000, accompanied with 25 of the Hill Company bonds held as collateral, and received payment therefor, but in December, 1908, he did not comply with a request from Taylor to forward the last note of $16,000 with accompanying bonds for collection, and on January 18, 1909, filed the present bill.

The immediate facts concerning the sale of ''The

Engineer'' and the greater part of the assets of the Taylor Publishing Company to the Hill Publishing Co., so far as they are conceded and not disputed in the evidence, are these:

Taylor was in New York from February 26, 1908, to March 1, 1908. During that time he met Mr. Harris, the broker who had been and was interested in trying to effect the sale of ''The Engineer'' to the Hill Company. On February 29th (the day of a telegram recited above from Taylor to Bawden) Harris came to Hill, the president of the Hill Publishing Company in New York, and presented to him a draft of an agreement, undated and unsigned, but with spaces left for the signatures of the president of the Taylor Company and the Hill Company, which draft did not differ materially from the ''counter'' proposition of the Hill Company of the date of January 13, 1908, before alluded to, except that the title to The Engineer was to be given before March 9, 1908, and that the sum mentioned for the purchase price of the various assets of the Taylor Company to be delivered was $225,000 instead of $150,000, the said payment to be in bonds, $50,000 in one year from date of transfer, $50,000 in two years, $50,000 in three years and $75,000 in four years, all with the right of anticipation in payment at the option of the Hill Company. It contained the same provision requiring Taylor's abstention from publishing a similar trade paper in the United States for twenty-five years.

On this draft of agreement Hill wrote the following endorsement:

''Mr. Emerson P. Harris:

You are hereby authorized to accept a proposition like this agreement on or before Wednesday, March 4th, 1908, in our behalf. Dated New York, February 29th, 1908.

HILL PUBLISHING COMPANY,<br>JOHN A. HILL, President.''

Mr. Harris came on from New York to Chicago and arrived here Sunday night or Monday morning (March 1st or March 2nd). Wednesday, March 4th, the day the "option" contract between Bawden and Taylor was signed, Harris showed Taylor the draft of agreement hereinbefore described and the endorsement of Hill upon it. On March 4th also Harris telegraphed to Hill in New York. Hill left New York on the afternoon train for Chicago, arriving here Thursday, March 5th. On that day a contract was signed by the Taylor Publishing Company and the Hill Publishing Company, by their respective presidents, Taylor and Hill, and by Taylor personally, and witnessed by Harris and Mr. C. F. Loesch, Mr. Taylor's lawyer, which, with some slight changes and additions, conformed to the draft presented by Harris to Hill and approved by him on February 29th.

The agreement was "to sell and to give perfect title to 'The Engineer'," etc., "on or before the 11th day of March, 1908;" and the abstention from business of Taylor was to be "except only under the employment or direction" of the Hill Company.

As before indicated, the Hill Publishing Company authorized the necessary issue of bonds on March 5th. They were immediately printed and brought to Chicago by Mr. Hill's secretary. On March 9, 1908, which was the same day that Bawden's stock was delivered to Taylor in exchange for the cash, notes and bonds given for it, the business between the Taylor Publishing Company and the Hill Publishing Company was concluded.

The board of directors of the Taylor Publishing Company consisted of Taylor, and a Mr. Rice and a Mr. Shaw. Rice and Shaw at that time held between them 49 shares of stock, Taylor with Bawden's stock having 851 and without it 451 shares. There were no other stockholders. The directors held a meeting on March 9th, and placed upon the record of the com-

pany a recital of the proposition of the Hill Company embodied in the agreement of March 5th, accepted it and ordered it executed by the president and secretary.

A meeting of the stockholders was also held on that day, March 9th, and according to the recital of the secretary in the record, a resolution approving the sale and ratifying the action of the directors was adopted by the unanimous vote of "the holders of all the stock," the holdings of Bawden evidently being considered at that time to have passed to Taylor.   Then a formal bill of sale of "The Trade Journal known as The Engineer" and of the other assets of the Taylor Company included in the sale was formally executed by Taylor as president and Rice as secretary, and with a memorandum agreement of Taylor as to his abstention from a competing business, and certified copies of the resolution of the directors' meeting and of the stockholders' meeting of the Taylor Publishing Company, delivered to Mr. Hill, who in turn transferred to Mr. Taylor 225 bonds of the Hill Company.  Of these, after that delivery, but on the same day, Taylor must have delivered 56 to the First National Bank for transmission to the Bank at Houghton.

Viewed with reference to the "option" agreement between Bawden and Taylor of March 4th, this collocation and relation of events raises only a suspicion and does not furnish proof of the concealment by Taylor from Bawden of knowledge on his part of any offer, past or prospective, by the Hill Company greater or different than that which he had reported to Bawden in January of $150,000.  Taylor swears that he did not go to New York in February with the sole object of negotiating with Hill, and that he did not see the proposed agreement or authority of the Hill Company dated February 29th until after he had executed the option contract with Bawden,—thus adding his oath

to the truthfulness of the statement to that effect he made in his letter of July 24, 1908.

Harris testifies that he first made known the contents of the paper to Taylor about "the middle of the week" he arrived in Chicago from New York, "when Taylor was prepared to do business" "after he was prepared to deliver the property," and that so far as he knew the contents of the paper in question were made known to no one but his confidential secretary before that; and Mr. Hill says that there were after January 13, 1908, no other propositions made by him looking to the purchase of The Engineer and accompanying assets until the one of February 29th; that he did not see Taylor in New York or elsewhere after the 13th of January until he saw him in Chicago on March 5th, when the contract was executed. Moreover, although it is apparently claimed that Bawden was purposely left under the impression that all the stock of the Taylor Company, rather than some of its assets, was the subject of the negotiations for sale that Taylor was carrying on, it must be conceded that the letters and telegrams of Taylor, carefully read, would have shown Bawden a distinction always made by Taylor in speaking of his proposed transactions with Hill and of those with Bawden. It was "The Engineer" that was to be sold to Hill; it was Bawden's "stock" that was to be purchased. However wanting in ingenuousness Taylor's dealings with Bawden may have been, and however strong a natural suspicion that when making efforts in February to purchase Bawden's stock at as low a figure as possible, he had reason to expect an offer from Hill such as he finally received, we do not think that suspicion would be sufficient to warrant a finding on our part—if such finding were material—that Taylor had actual notice before March 5th of the offer which it is claimed by Bawden was wrongfully concealed. Before March 9th, however, when the sale of Bawden's "stock" was actually car-

ried out according to the terms specified in the "option" contract, by the delivery of the stock by Bawden's agent and the transfer to said agent for Bawden of the Taylor notes and Hill bonds, the terms of the sale to Hill were not only known to Taylor, but the sale of "The Engineer" and the accompanying assets had actually been made by the directors of the Taylor Company to the Hill Company. The question is, therefore: Was Taylor on March 9th, having only an "option" contract to buy the stock, bound before actually purchasing the same and taking it into his possession on the terms previously indicated by Bawden as satisfactory to him, to reveal to Bawden the fact of the sale of "The Engineer" and the terms of the sale? Did we consider the contention of the complainant well founded, that Taylor and Bawden stood in fiduciary relations to each other, that Taylor was in fact or law in the position of a trustee for Bawden in the matter of the disposal of his stock,—that is, in the language of Irwin v. Sample, 213 Ill. 160, that there was "confidence on one side and resulting superiority and influence on the other," we should feel great reluctance to hold that Taylor was not so legally bound, as he certainly would have been ethically. But whatever we may think of the whole conduct of business between the parties to this litigation, we cannot, after a careful consideration of the evidence in the record, which is mostly documentary, bring ourselves to the opinion that any such relation of trust and confidence in fact existed. To discuss and analyze that evidence in this opinion would be useless. It is sufficient to say that it seems to us plain that Bawden distrusted rather than trusted Taylor during a long period, beginning much before these negotiations with the Hill Company, that although anxious naturally to obtain as much as he could for his stock, he wanted to sell it and terminate his relations with one connected with him by family ties, who had, to quote Bawden's

language (well or ill chosen) in a letter to Taylor of
March 23, 1907, "used tactics" in the corporation elec-
tion of 1907 which "constituted the most flagrant
breach of honor and evidently were the result of a
premeditated, carefully planned scheme of the most
malicious treachery that could be conceived." What-
ever the relations in the beginning of the business, we
think that as a matter of fact in 1907 Bawden and Tay-
lor were mutually antagonistic in feeling and dealing
at arms length. If Bawden was misled into action,
either in making or carrying out the option contract,
that he would not have otherwise taken, by mere want
of knowledge of the negotiations or executed transac-
tions which Taylor had carried through, we do not
think that it was due to any personal feeling of trust
and confidence placed by him in Taylor.

Nor do we think that the situation so comes within
the rules which make an officer and director of a cor-
poration, in some cases and in a limited sense, a trustee
for a stockholder individually, as to make the disclos-
ure to Bawden personally of what the directors of the
Taylor Publishing Company were about to do or had
done between March 5th and March 9th, obligatory on
Taylor. If the argument, somewhat forcefully made
by appellees, is sound, that the Supreme Court in such
cases as Schlee v. Guckenheimer, 179 Ill. 593, Osgood
v. Skinner, 211 Ill. 229, and Kantzler v. Bensinger et
al., 214 Ill. 589, has so construed and limited the appli-
cation of section 130 of the Criminal Code as to bring
the "option" contract of March 5th out of the opera-
tion of Schneider v. Turner, 130 Ill. 28 (which case
it has certainly never overruled), then the relative
rights of Taylor and Bawden had been fixed before the
knowledge of Taylor shown by the evidence. But even
if this be not so and these relative rights be judged as
of the time when the purchase and sale between them
was completed on March 9th, although the matter may
be close to the line, do we think that the sale can be

avoided because of Taylor's silence.    That he knew
or must have strongly suspected that Bawden would
probably have been reluctant to sell his stock at the
price he had offered it at on March 5th, had he known
that the assets sold had realized $225,000, goes with-
out saying.    Taylor, of course, believed, as did Mr.
Hill and Mr. Harris, that the·"option" contract of
March 5th fixed the rights and holdings of the stock-
holders and gave him (Taylor) the actual control of
the 400 shares of Bawden even before he received the
certificate.    The action in holding, and the minutes of,
the stockholders' meeting show this belief.    But even
if this theory were not true, there are not in this case
the elements which made the Supreme Court of the
United States in Strong v. Repide, 213 U. S. 419, say
that in that case the duty did exist for the director to
disclose to an individual stockholder his knowledge af-
fecting the value of the shares, nor to take it out of the
doctrine announced for Illinois in Hooker v. Midland
Steel Co., 215 Ill. 444, that while directors occupy to
stockholders as a body the position of trustees, a di-
rector has no such relation to an individual stock-
holder with respect to his stock, but "may deal with an
individual stockholder and purchase his stock prac-
tically on the same terms as a stranger."    (p. 451.)

The claim of the complainant, therefore, so far as it
is based on an alleged fiduciary relation which obliged
Taylor to disclose information to Bawden which he
merely withheld, we hold unfounded.    Bawden had
enough information to put him on his guard and sug-
gest investigation, and took the chances when he acted
without carrying it further.    And it may be noted that
by constant reports made to him by the company and
the constant touch which he maintained with the busi-
ness of the company before these negotiations for sale
of "The Engineer" began, Bawden had been enabled
at all times to judge of the actual value of his holdings.

But his claim is not wholly based on this theory of a fiduciary relation and culpable silence. He, through his counsel, argues that there was active misrepresentation and fraud on the part of Taylor in misleading him into the belief that all the stock of the company, rather than the larger portion of its assets only, was to be sold, and that the price to be paid for that stock was such that his proportionate share, based on his relative holding, would be practically what he contracted to sell to Taylor for. If such a misrepresentation was made, it is not necessary to invoke any theory of a fiduciary relation to secure relief. And it is true that "the silence which gives assent" may sometimes be in law and in fact as active a misrepresentation as spoken or written words.

It is here claimed that Bawden, evidently having, as Taylor must have known, the erroneous view of the matter here described, was studiously kept in that state of mind by Taylor by affirmative statement and by apparent acquiescence. We have already noted that, however disingenuous or wanting in chivalric business honor Taylor's conduct may have been, he certainly did not, in his letters and communications with Bawden, in speaking of a sale to Hill, apparently ever lose sight of a distinction between "The Engineer" and the "Taylor Publishing Company." But there is stronger reason than this for an inability on our part to differ from the learned chancellor below on this branch of the case. Taylor testified that on March 3, 1908, in the first day's conversation about the "option" contract, "Bawden wanted to know what the paper was going to be sold for—the price it was going to bring," and that he (Taylor) told him that was a very fair question, but that he did not know; that he had, however, agreed with Mr. Shaw that the paper would not be sold for less than $200,000, and that it would not be sold for less than that sum. He says that Bawden replied to that: "In that case you are going to get very much

more out of this property than I will get;'' to which he (Taylor) answered that he was entitled to more on account of his salary, which would cease, and which prevented him from being able to afford to sell his interest for the price Bawden would take for his. ''I explained to him,'' Taylor says, ''that the paper was being sold so that he (Bawden), who was anxious to sell, could get his money out of it.''

Taylor also testified that on March 4th practically the same conversation occurred. His exact language was: ''After awhile Mr. Bawden said he did not think that it was at all necessary for an option to be signed, and I told Mr. Bawden at that time that I had an option at one time and he changed the figures and he might change them again, and that the property would not be sold unless we did have an agreement right then and there. He again reiterated; he said, 'You will be getting more out of this than I will.' Then he asked me point blank what 'The Engineer' was going to be sold for, and I told him I did not know; that if it did not sell for at least $200,000, the property would not be sold.''

Mr. Bawden denied on the stand that any such conversation occurred on either occasion, save only as to his opinion that it was not necessary to give an option.

But Taylor placed on the witness stand Mr. C. F. Loesch, a lawyer of Chicago, who was present at the conversation of March 4th, and he testified: ''Mr. Bawden said, 'What are you going to sell The Engineer for?' or 'What are you going to make out of this?' I do not know which form of the two questions it was, and Mr. Taylor said, 'I have already told you that if I do not get $200,000 or more there will be no sale'.''

We cannot dispose of this evidence, and we do not think the chancellor below could, by ''paying no attention'' to it. (Complainant's Reply Brief, page 29.) Loesch is unimpeached, and if the testimony is true it shows that no direct misrepresentation could have been

made by Taylor at that final meeting of March 4th, to the effect that "The Engineer" or the stock of the Taylor Publishing Company was to be sold for an amount merely proportional to that which Bawden was getting for his holdings. And as this was the final meeting and the conversation took place, according to Loesch, an hour or more before the option was signed, we must infer that if Loesch's testimony be taken as true that the alleged misleading of Bawden to believe that he was going to get a proportionate amount of the whole product of the sale to the Hill Company (if it were made), by acquiescence in his apparent belief to that effect, was neutralized before he took action; and so, too, must have been any actual assurances of that purport, if they had existed.

The argument is strong for the position that Taylor's consent to a sale was worth more than Bawden's. He was the manager and builder of the business evidently, the expert whose experience and ability made the publication profitable. He was giving up a salaried position assured to him so long as he kept control of the stock and ran the paper. He was obliged on a sale to bind himself for twenty-five years to keep out of the field he had become a power in. And there is direct evidence that Bawden recognized this. This, so far as it goes, tends to confirm the probability of the conversation sworn to by Taylor and Loesch.

Charles Sanford Clark testified that in May, 1907, in a conversation to which Mr. Bawden, Mr. Taylor and himself were parties and in which Bawden was pressing for the sale of "the property," Mr. Taylor said that "his stock was worth more to him," and Mr. Bawden replied that "he had conceded that in a previous understanding."

This previous understanding was undoubtedly expressed in the letter of Bawden to Taylor of February 15, 1907, which runs as follows:

"To avoid further misunderstanding I thought best to repeat in writing that portion of our conversation which took place at the Auditorium Tuesday, relating to the price at which we would be willing to dispose of our interests in the Taylor Publishing Co., and as I now recollect, you placed the amount at which you would be willing to sell your 4-9 interest at $90,000. I placed the amount at which I would be willing to sell my 4-9 interest at $75,000, but there was nothing said as to the length of time we would hold the matter open, and I think this should be stated.

"I am convinced more than ever since receiving the statement of the expert accountants which I found on my return, that my offer is a generous one, and I do not feel justified in allowing it to stand indefinitely. Therefore, supposing we say that both offers will stand until April 1st, 1907, unless other proposals are made in the meantime."

We think the chancellor in the Superior Court was justified in his decree, and it is affirmed.

*Affirmed.*